UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

PATRICIA R. BRINSER,

            Plaintiff,

v.

MICHAEL J. ASTRUE[1], Commissioner of
Social Security,

            Defendant.
_____

Case No.  5:06-cv-142-Oc-GRJ

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for disability insurance and Supplemental Security Income benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 3) and both parties have filed briefs outlining their respective positions.  (Docs. 11 & 12.)  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED.**

## I. PROCEDURAL HISTORY

Plaintiff filed applications for SSDI and SSI benefits on October 3, 2002 and September 19, 2002, respectively, claiming a disability onset date of November 3, 2001. (R. 58, 60-62.)  Plaintiff's application was denied initially (R. 43-46), and upon reconsideration. (R. 15, 24-30.)  Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Administrative Law Judge ("ALJ"). (R. 15, 24-30.)The ALJ conducted Plaintiff's administrative hearing on January 3, 2005 (R. 383-400) and issued a decision unfavorable to Plaintiff on May 13, 2005. (R. 12-21.)  The Appeals Council denied Plaintiff's request for review on February 16, 2006. (R. 6-8.)  On April 18, 2006, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[2] See 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]  The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[12] Fourth, if a claimant's impairments do not prevent her from doing past

---

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are

---

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[17] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

### III. **SUMMARY OF THE EVIDENCE**

Plaintiff was born on October 7, 1958 and was forty-six (46) years old at the time of the decision. (R. 385.) Plaintiff has a high school education, completed cosmetology school (R. 386), and has past relevant work history as a production worker at a candy manufacturing company, school photographer, and telemarketer. (R. 84, 386.)  Plaintiff contends that she became disabled on November 3, 2001 due to degenerative disc disease resulting from a work related injury and chronic lower back pain. (R. 75, 386.)

Based upon the evidence submitted and the testimony presented at the hearing, the ALJ determined that Plaintiff suffers from obesity and status-post lumbar laminectomy and fusion, with residual chronic lower back pain. (R. 20.)

---

[19] Walker at 1003.

[20] Wolfe at 1077-78.

[21] See id.

[22] See Doughty at 1278 n.2.

Plaintiff was injured at work on October 2, 1997 when she was carrying 35 pounds of photographer equipment in each hand. Shortly thereafter she developed back and leg pain. Plaintiff had no prior history of back pain prior to this incident. Plaintiff's EMG results in July 2001 were abnormal and showed right L5 radiculopathy. (R. 314.) In August 2001, Robert D. Gruber, D.O., Ms. Brinser's treating physician, ordered a CT scan that revealed findings consistent with full thickness annular tear at L4-L5 level towards the left neural foramen, and partial annular tear at L5-S1 level towards right neural foramen. (R. 312.)

On November 9, 2001 Plaintiff was referred by her worker's compensation carrier to G. Grady McBride, M.D. at the Orlando Orthopaedic Center for a second surgical opinion for low back and right leg pain. (R. 150.) Plaintiff reported 4/10 low back pain that radiated into the right leg down to the ankle and foot. Her lower back pain accounted for 75% of her symptoms. Plaintiff reported that her pain was constant and described the pain as stabbing, aching, and burning, with numbness. Plaintiff reported it worsened with prolonged sitting and that physical therapy and epidural steroid injections provided no relief. Plaintiff reported that she could no longer work as a photographer after the injury, so she returned to work as a telemarketer in April 2001, but was not able to tolerate the pain. Plaintiff reported using a walking cane and stated that she could not tolerate narcotic pain medicine because it exacerbated her migraines.

Dr. McBride observed that Plaintiff ambulated with an antalgic gait and had a rather flat affect throughout her history taking and physical examination. Plaintiff had difficulty heel and toe walking secondary to complaints of increased pain. Dr. McBride diagnosed Plaintiff with lumbosacral strain. However, Dr. McBride found Plaintiff would

not be a good surgical candidate because Plaintiff exhibited "some symptom magnification" and had a "positive pain response with three level discogram." (R. 155.)

On November 13, 2001, Plaintiff was admitted to Sun Coast Hospital where she underwent a decompression lumbar laminectomy at L4-S1 and diskectomy/fusions at L4-L5 and L5-S1. (R. 159.) The surgery was performed by Scott Webb, D.O. On December 14, 2001, Plaintiff returned to Dr. Webb with complaints of headaches that would occur in the upright or sitting position that would resolve with reclining. Plaintiff underwent an incision and exploration of previous lumbar laminectomy site and a repair of a spinal fluid leak. (R. 179-180.)

At her January 7, 2002 visit with Dr. Webb, Plaintiff reported that the headaches had resolved and that she was walking 10 or 15 minutes per day and continued to use a cane. Plaintiff decreased her pain medication, but continued to experience some lumbar discomfort. Plaintiff reported to Dr. Webb that while she continued to experience some intermittent discomfort down the right leg, her preoperative leg pain had improved significantly. (R. 259.) Dr. Webb recommended that Plaintiff begin aquatic therapy 3 times per week for 4 weeks progressing to land therapy. In addition, Dr. Webb recommended that Plaintiff remain on temporary total disability. (R. 259.)

Plaintiff returned to Dr. Webb on February 11, 2002 for a follow-up visit. Plaintiff complained of experiencing increased back pain on the right side shortly after beginning physical therapy and that she was taking 1-2 Lortabs every 6 hours. Upon physical examination, Dr. Webb found Plaintiff to have tenderness over the right sacroiliac joint area and that Plaintiff ambulated with a slightly antalgic gait to the right. Dr. Webb's impression was that Plaintiff probably suffered from right sacroiliac joint dysfunction and

referred Plaintiff to Dr. Gruber for treatment of this condition. Dr. Webb continued his recommendation that Plaintiff remain on temporary total disability. (R. 256.)

Plaintiff was examined by Dr. Gruber on May 3, 2002. Plaintiff reported minimal response from sacroiliac joint injections and continued to complain of pain in the low back with radiation into the right leg with standing and walking. Plaintiff also complained of slight external rotation of the right leg during stance phase. Dr. Gruber's examination revealed intact heel and toe walking. Plaintiff did have externally rotated posture to her right lower extremity with ambulation. Dr. Gruber noted that there was "palpation right sciatic notch." Dr. Gruber diagnosed Plaintiff with post laminectomy syndrome with residual right lumbar radiculitis, right sacroiliitis, suspect piriformis contraction with muscular gait abnormality, and postoperative MRI consistent with early low grade epidural fibrosis in the right L5-S1 root, distribution consistent with her clinical radiculitis.

Dr. Gruber prescribed Plaintiff Topamax to address her radicular pain and stated that he did not believe that Plaintiff was able to return to full duty work. He noted that a functional capacity evaluation would be necessary to establish a safe return to work. Dr. Gruber further assessed that Plaintiff should remain at total disability pending reassessment after the Topamax trial. (R. 249.)

Plaintiff was examined by Dr. Webb on July 18, 2002. Dr. Webb concluded that Plaintiff continued to suffer from persistent right sacroiliac joint dysfunction and recommended that Plaintiff see Francisco M. Torres-Ramos, M.D. for an evaluation. (R. 240.)

Dr. Torres examined Plaintiff on August 2, 2002. Plaintiff complained of pain in the hip area, mostly on the right, that radiated into the right posterior thigh. Plaintiff

reported that the pain was constant and it became worse when she put weight on her right leg. At the time of this visit Plaintiff was taking Prozac, Prevacid, Premarin, Lortab, Docusate, and Imitrex.

Dr. Torres' examination revealed that Plaintiff was alert, pleasant, cooperative and oriented. Plaintiff had pain to palpation over the right sacral sulcus and poor 1-legged standing balance bilaterally. Plaintiff stood with a flexed right knee and had difficulty putting weight through the hip joint. Dr. Torres' impression was that Plaintiff suffered from bilateral sacroiliitis, lumbar discogenic pain, and status post laminectomy with posterior fusion and resolving seroma at the laminectomy site. Dr. Torres recommended Plaintiff for prolotherapy for her sacroiliitis and follow-up care with Dr. Gerber. (R. 236-237.)

At Plaintiff's follow-up visit with Dr. Gruber on September 27, 2002, Dr. Gruber noted that Plaintiff had an antalgic gait and required a cane for stability. Inspection of Plaintiff's spine revealed lumbar incision with "diffuse paraspinal tenderness and localizing spasm. Range of motion is grossly restricted." Dr. Gruber advised Plaintiff to "await response to prolotherapy treatments" and he increased Plaintiff's Lortab dosage.(R. 232.)

Plaintiff returned to Dr. Gruber on October 18, 2002. Plaintiff stated that she had no relief from the prolotherapy injections. Plaintiff reported that her lower back pain had increased in severity, frequency and duration, mostly right-sided and that it radiated into the right leg all the way down to her foot and toes. Plaintiff stated her pain was averaging 9 on a scale of 10. Plaintiff reported that she was unable to participate in any sport or recreational activities. Plaintiff was taking Lortab 10/500, which she averaged 4

times per day, Welbutrin and Prozac. Plaintiff reported a walking and standing intolerance. Plaintiff used a cane for grocery shopping, which she reported was her only real time out of her house.

Dr. Grurber noted that Plaintiff continued to walk with an antalgic gait, that she used a cane and was unable to heel or toe walk due to pain. Plaintiff had diffuse lumbosacral tenderness, more marked on the right S1 joint as opposed to the left. Dr. Grurber advised Plaintiff to have chronic pain management and she was given a prescription for a Functional Capacity Evaluation to better assess her capabilities. (R. 229.)

A Functional Capacity Evaluation of Plaintiff was performed on February 6, 2003 and February 12, 2003 by Kristen K. Swensen, MPT. Ms. Swensen concluded that Plaintiff was functioning in the light category as defined by the DOT. Light work entails exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Ms. Swensen found that Plaintiff is unable to crouch or repetitively squat; can only occasionally stand or walk, can sit without limitation, and can frequently carry up to 15 pounds. (R. 182-190.)

At the request of the state agency, Plaintiff was examined by Dantuluri P. Raju, M.D. on February 24, 2003. Dr. Raju noted that Plaintiff was able to get up and walk unassisted, but that she came with a cane. It was noted that Plaintiff's gait was stiff and limping. Plaintiff had "minimal difficulty" getting on and off the exam table and when sitting up from a flat lying position. Dr. Raju noted that Plaintiff's cervical spine was abnormal with stiffness and tenderness. Her lumbar spine was also stiff and tender and

muscle spasms were noted. Dr. Raju diagnosed Plaintiff with low back pain, post laminectomy, GERD, depression, headache and menopause. (R. 193-194.)  On March 6, 2003 a medical disability adjudicator sent correspondence to Dr. Raju and asked if Plaintiff's cane was "medically required for ambulation." Dr. Raju responded only that Plaintiff "can walk 50 feet without cane." (R. 97.)

At the request of the state agency, Plaintiff was psychologically assessed by David M. Bortnick, PhD, PsyD, P.A. on March 3, 3002. Dr. Bortnick concluded that Plaintiff had adjustment disorder with depressed mood by history in remission. Dr. Bortnick further concluded that Plaintiff "has the mental ability to work in some capacity." (R. 196-197.)

Shortly after the Functional Capacity Evaluation, Plaintiff returned for a follow-up visit with Dr. Gruber. Dr. Gruber stated that although the evaluation placed her in a light duty capacity, that Plaintiff's pain was "extremely exacerbated" after the test. Dr. Gruber said it was "doubtful that she will be able to perform on a regular basis in a light duty capacity, given her intolerance for such level even on a 1 day exam. Again, I believe she is capable of no more than sedentary part-time work and given the multiple medications that she is consuming, I believe that may even be impossible for her." (R. 223.)

On March 13, 2003, Donald Warren Morford, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Morford concluded that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds. Plaintiff could stand and/or walk at least 2 hours in an 8-hour workday and sit about 6 hours in an 8 hour workday. Plaintiff had no pushing or pulling limitations and had only

occasional postural limitations. Dr. Morford's notes state that "limited standing/walking seems feasible." (R. 198-205.) On July 31, 2003, state agency physician, Ann Takach, M.D. completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. 318-325.) Dr. Takach's findings were consistent with Dr. Morford's, with the exception that Dr. Takach found that Plaintiff can never climb.

On March 14, 2003, state agency physician, Gary W. Buffone, Ph.D., completed a Psychiatric Review Technique form. Dr. Buffone found that Plaintiff had an affective disorder that was not severe. (R. 206.) Dr. Buffone opined that Plaintiff had a mild restriction on her activities of daily living, mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace. Dr. Buffone found no episodes of decompensation. (R. 216.) On August 18, 2003, state agency physician, Susan Conley, Ph.D., completed a Psychiatric Review Technique form for Plaintiff. Her findings were consistent with those of Dr. Buffone. (R. 326-339.)

Plaintiff was evaluated by Rodney A. Poetter, PhD on November 21, 2003. Dr. Poetter diagnosed Plaintiff with major depressive disorder, recurrent, severe, without psychotic features, and pain disorder associated with both psychological factors and a general medical condition. On March 18, 2004, Dr. Poetter indicated that Plaintiff suffered from major depression, recurrent, severe and pain disorder. Dr. Poetter assigned Plaintiff a Global Assessment of Functioning ("GAF") of 41. A GAF Score of 41 is defined as manifesting "serious symptoms." Dr. Poetter found that Plaintiff's condition was worsening and that her psychiatric condition exacerbated her pain. In addition, Dr. Poetter noted that Plaintiff would be absent from work more than three times per month.

In evaluating her mental abilities and aptitude needed to do unskilled work, Dr. Poetter opined that Plaintiff had poor or no ability to maintain attention for a two hour segment and had poor or no ability to maintain regular attendance and be punctual within customary, usually strict tolerances. Further, Dr. Poetter found that Plaintiff has poor or no inability to complete a normal workday and workweek without interruptions from psychologically based symptoms and poor to no ability to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Poetter opined that Plaintiff has a fair ability to understand, remember and carry out detailed instructions.

Finally, Dr. Poetter opined that Plaintiff has marked restrictions on her activities of daily living, constant deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner, and continual episodes of deterioration or decompensation in work or work-like settings. (R. 362-366.)

The medical records of Dr. Brent Leytem and his nurse practitioner, Molly Nicholas, disclose that Plaintiff was treated for depression since at least March 2002. (R. 345.) Plaintiff exhibited increased irritability, obsessive behaviors and a flat affect, for which Dr. Leytem increased her Prozac dosage. In October 2002, Plaintiff reported low energy, lack of interest in normal activities, an improvement in her mood but impacted concentration. Plaintiff was diagnosed with depression, reflux and chronic lumbar pain. (R. 343-344.) In October 2003, Plaintiff reported an increase in the severity of her pain. In January 2004, Plaintiff was diagnosed with depression. In July 2004, Plaintiff described feelings of sadness and an increase in compulsions, including counting stairs. (R. 372.) As of November 5, 2004, Plaintiff reported that she was feeling

13

well with the combined medications of Lexapro and Wellbutrin. She was again diagnosed with reflux and anxiety/depression. (R. 370.)

## IV.  DISCUSSION

Plaintiff's primary argument is that the ALJ erred in issuing an RFC assessment that is not supported by any of the medical opinions of record, including the opinions of the non-examining state agency physicians and both of Plaintiff's treating specialists.

According to Plaintiff, the ALJ failed to acknowledge the inconsistencies between the non-examining physicians' opinions and his own RFC finding, and failed to articulate good cause for discrediting the opinions of Drs. Hanna and Gruber, Plaintiff's treating specialists. Plaintiff argues that the ALJ also failed to articulate good cause for discrediting Dr. Poetter, and failed to explain any reason for not crediting Dr. Raju's opinion as to Plaintiff's need to use a cane.

In his RFC analysis, the ALJ determined that Plaintiff is capable of performing her past relevant work as a school photographer or telemarketer, as it is performed in the national economy. The ALJ concluded that Plaintiff retains the residual functional capacity (RFC) to lift and carry up to ten pounds frequently and 20 pounds occasionally, stand and/or walk for a total of up to six hours per eight-hour workday, and sit (with normal breaks) for a total of up to six hours per eight-hour workday, with the added requirement that she have the option to alternate at will between sitting and standing.

The ALJ discredited the opinions of Drs. Poetter and Hanna, and never specified what weight, if any, was given to the opinions of Drs. Webb or Gruber. Instead, as support for his RFC finding, the ALJ relied upon the March, July and August 2003 reports from non-examining state agency physicians. The ALJ stated that these non-

examining physicians concluded that Plaintiff's physical and mental ability to perform work-related activities was at a limited range of light work, without significant mental limitations. (R. 20.)

However, a review of the medical evaluation of Drs. Morford and Takach, the non-examining state agency physicians, reveals that they found Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, stand and/or walk at least 2 hours in an 8-hour workday and sit about 6 hours in an 8 hour workday. Neither of these physicians found that Plaintiff could stand and/or walk for 6 hours in an 8 hour workday. Indeed, there is absolutely no medical evidence in the record to support the ALJ's finding that Plaintiff can stand and/or walk for 6 hours in an 8 hour workday, and the ALJ provided no explanation for this inconsistency.

Not only did the non-examining state agency physicians find that Plaintiff could not stand and/or walk 6 hours in an 8 hour workday, Plaintiff's treating physicians also found that Plaintiff was incapable of this level of activity. Dr. Gruber opined that Plaintiff's symptoms were extremely exacerbated after her evaluation with a physical therapist and stated that it was doubtful that Plaintiff could perform work on a regular basis in a light duty capacity. Dr. Gruber expressed the view that at most Plaintiff might be capable of sedentary part-time work, and he doubted Plaintiff's ability to do even that considering the amount of medication Plaintiff was taking. Dr. Hanna agreed with Dr. Gruber's work status assessment in his evaluation of Plaintiff.

Pursuant to SSR 96-8p, an RFC is assessed by adjudicators at each level of the administrative review process "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any "medical source

statements" – i.e., opinions about what the individual can still do despite his impairments, submitted by an individual's treating source or other acceptable medical sources."[23] In the instant case, there simply is no medical evidence in the record to support the ALJ's assessment that Plaintiff can stand and/or walk for 6 hours in an 8 hour workday.

In addition to the ALJ's failure to address the inconsistencies between his RFC assessment and the assessments of the state agency physicians, the ALJ also failed to articulate good cause for discrediting the opinions of Plaintiff's treating specialists, Drs. Hanna and Gruber. The ALJ stated that the opinion of Dr. Hanna was rejected because Dr. Hanna's opinion was "inconsistent with the weight of the medical evidence of record, which showed that, despite spinal tenderness and stiffness, she [Plaintiff] had generally good strength and mobility."[24] However, the ALJ's conclusory statement that Dr. Hanna's opinion is inconsistent with the weight of the evidence ignores the fact that Drs. Hanna, Gruber and Webb - specialists at the Florida Spine Institute, who began treating Plaintiff in 2001 - based their findings and opinions on their extensive treatment history of Plaintiff as well as on the objective medical evidence, including numerous CT scans.[25] Accordingly, the ALJ's statement that Dr. Hanna's assessments were not based upon objective medical evidence is simply contrary to the medical evidence of record.

---

[23] SSR 96-8p.

[24] R. 19.

[25] R. 312.

Moreover, not only did the ALJ fail to give controlling weight to the well-supported medical opinions of Dr. Hanna, the ALJ also failed to even mention the medical assessment by Plaintiff's long-time treating physician, Dr. Gruber and failed to state what weight, if any, was given to Dr. Webb's medical opinions. The law is well established that If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, the treating source's opinion must be given controlling weight.[26]

The Plaintiff also argues that the ALJ improperly rejected the opinions of Drs. Poetter and Raju. The ALJ found that Dr. Poetter was not a treating source because Dr. Poetter had not seen Plaintiff "three times for treatment of the condition about which the offered opinion is based"[27] and that Dr. Poetter's opinions were not given great weight due to "internal inconsistencies" between Dr. Poetter's opinion and the weight of the medical evidence. Specifically, the ALJ stated that Plaintiff's depression responded well to the use of medication.

The problem with this statement is that the ALJ failed to state with any specificity what "internal inconsistencies" exist in Dr. Poetter's opinion. Further, Dr. Poetter did not provide an opinion solely on the issue of Plaintiff's depression. Dr. Poetter's evaluation also took into consideration Plaintiff's paranoia, difficulty thinking or concentrating, social withdrawal and isolation. In addition, Dr. Poetter evaluated Plaintiff on her mental abilities and aptitude needed to perform unskilled work and found that Plaintiff had poor

---

[26] SSR 96-2p.

[27] R. 19.

or no ability to maintain attention for a two-hour segment, or maintain regular attendance.[28]

Furthermore, Dr. Poetter's opinions were corroborated by the opinion of Dr. Leytem, who found that Plaintiff was having difficulty concentrating and was suffering from obsessive behaviors.[29] While later progress notes disclose that Plaintiff's depression was improving from a new combination of drugs, those notes do not disclose that any of Plaintiff's other psychological problems had been resolved. Therefore, the ALJ err by failing to state what weight, if any, was given to Dr. Leytem's opinion and for dismissing Dr. Poetter's entire opinion.

Lastly, the ALJ also erred by failing to evaluate properly Plaintiff's ability to perform her past relevant work. The ALJ concluded that Plaintiff could return to her past relevant work as a telemarketer and a school photographer. However, the ALJ failed to discuss or analyze the requirements of these occupations.

According to the Commissioner, despite the fact that the ALJ did not specifically discuss the functional demands of Plaintiff's work as a school photographer, the ALJ took into account the entire record, including Plaintiff's description of her work during the Functional Capacity Evaluation of February 12, 2003. However, the physical therapist who performed the evaluation stated: "[a]s the employee describes her job, the position would be classified as HEAVY demand category."[30] The claimant is the "primary source" for vocational documentation, and "statements by the claimant regarding past work are

---

[28] R. 364.

[29] R. 340-346.

[30] R. 185.

generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work."[31] In addition, the decision as to whether the claimant retains the functional capacity to perform past work has "far-reaching implications and must be developed and explained fully in the disability decision," and "every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit."[32]

The ALJ provided no explanation for his conclusion that Plaintiff could perform her past relevant work and failed to discuss the vast discrepancy between Plaintiff's description of her job and his finding that Plaintiff can only do light work. Moreover, the ALJ failed to explain how the option to alternate between sitting and standing, as found in his RFC analysis, could be accommodated in the position of school photographer.

Lastly, with regard to Plaintiff's previous position as a telemarketer, Plaintiff raises an issue as to whether this work was sufficient to constitute past relevant work. Based upon this record the Court cannot determine whether this work was substantial gainful activity. However, because this case is being reversed and remanded the ALJ should consider on remand the required factors to assess whether this occupation was performed at the level of substantial gainful activity so that it can be considered past relevant work.

## V. CONCLUSION

For the reasons discussed above, this action is due to be **REVERSED AND**

---

[31] SSR 82-62.

[32] Id.

**REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g) for the Commissioner to conduct further proceedings consistent with this Order and to conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on August 2, 2007.

*/s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel